**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| IN THE MATTER OF THE ADMINISTRATIVE INSPECTION<br><br>In re:  MICROFAB, INC. (FORMER) SUPERFUND SITE, 104 - 106 Haverhill Road, Amesbury, Massachusetts | )<br>)<br>)<br>)  Case No. 26-mj-4420-DHH<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF**
**UNITED STATES' *EX PARTE* APPLICATION FOR ADMINISTRATIVE**
**WARRANT EXTENSION PURSUANT TO CERCLA SECTION 104(e)**

## I.     INTRODUCTION

The United States of America, on behalf of the United States Environmental Protection Agency ("EPA"), respectfully applies *ex parte* for an additional two-year extension of a civil administrative inspection warrant, originally issued on August 10, 2021, in Case No. 21-mj-04228-DHH, and extended for three years on August 9, 2023, in Case No. 23-MJ-04459-DHH.  This further extension will allow EPA to complete a remedial investigation and feasibility study, prepare a Proposed Plan for public comment, select a remedy in a Record of Decision, and commence remedial design activities, under Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended ("CERCLA"), 42 U.S.C. § 9604(e), on a 13.8-acre parcel of abandoned contaminated property, located at 104-106 Haverhill Road, in Amesbury, Essex County, Massachusetts (the "Property"). Because a contractor is currently conducting ongoing remedial investigation and feasibility study activities at the Property, in order to avoid significant additional delays and costs, and associated risks to human health and the environment, the United States respectfully requests that the Court **expedite its review** of this application **and sign the attached access warrant by Monday, August 10, 2026**, when the current access warrant expires.  Affidavit of Lisa Thuot, EPA Remedial Project Manager, filed together with this Memorandum ("Thuot Aff.") ¶ 58.

The Property's owner of record is Microfab, Inc. ("Microfab"). *Id.* ¶¶ 20, 26. For 20 years, from approximately May 1967 to October 1987, Microfab used the Property for the manufacture of printed circuit boards, electroplating, and other metal finishing operations. *Id.* ¶¶ 21-22. During that time, Microfab disposed of hazardous wastes at the Property through multiple routes, including the discharge of untreated or improperly treated wastes from its manufacturing facility to a stream and wetlands, through spills and releases on unprotected ground, through improper waste management practices, and through a system of underground tanks, structures, perforated pipes, and trenches that directed waste into soils and groundwater. *Id.* ¶ 21.

Subsequent investigations by the City of Amesbury (the "City"), the Massachusetts Department of Environmental Protection ("MassDEP"), and the federal EPA discovered contamination in surface water, sediment, groundwater, and soils at and around the Property. *Id.* ¶¶ 28-29. Investigators sampled these contaminated media and found large quantities of a variety of hazardous substances, including volatile organic compounds ("VOCs"), such as trichloroethylene ("TCE"), cis-1,2-dichloroethylene, 1,1-dichloroethene, trans-1,2-dichloroethene, and vinyl chloride, semi-volatile organic compounds ("SVOCs"), cyanide, and heavy metals, such as arsenic, chromium, and lead, all of which are hazardous substances under CERCLA and its implementing regulations. *Id.* (citing 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4).

Without cleaning up the Property, Microfab declared bankruptcy in 1987 and was dissolved involuntarily three years later. *Id.* ¶ 23. Microfab's parent company, Semicon, Inc., also was dissolved. *Id.* ¶ 24. Since that time, the Property has been abandoned, inactive, and unoccupied. *Id.* ¶¶ 22, 31. The Property has also been a magnet for trespassers and vandals, including area residents and children. *Id.* ¶ 31. The abandoned manufacturing building is in

poor condition, with damaged structural integrity, leaky roofs, collapsed floors, and numerous openings. *Id.* ¶¶ 17, 31. Despite efforts by the City and EPA to secure the Property, trespassers have entered the building by breaching barricades, cutting holes in fencing, scaling the building, and climbing in from the roof. *Id.* ¶ 31. In addition, the City police has responded to several fires and other incidents on the Property. *Id.*

At least since 2014, EPA has tried unsuccessfully to gain voluntary access to investigate and characterize the nature and extent of contamination at the Property, but it has been unable to locate anyone willing or able to grant access. *Id.* ¶¶ 39, 42-43, 50. Therefore, starting in 2015, the United States applied *ex parte* to this Court for a series of administrative warrants authorizing EPA to access the Property, to gather information needed to determine the nature and extent of the contamination and what to do in response. *See id.* ¶¶ 39-40, 43-50 (describing access warrant applications in 2015, 2018, 2019, 2021, and 2023). Each time, the Court has granted access, which has allowed EPA to improve site security and gather valuable information needed to characterize and clean up the Site, to protect human health and the environment. *Id.* ¶¶ 29-35, 40-41, 43-50.

Based on information gathered in and around the Property, EPA designated the area impacted by Microfab's contamination the "Microfab, Inc. (Former) Superfund Site" (the "Site"). *Id.* ¶¶ 1, 7, 21, 28. In 2017, EPA added the Site to the National Priorities List of contaminated properties with the highest priority in the country for investigation and cleanup under CERCLA. *Id.* ¶ 7; *Federal Register*, 82 Fed. Reg. 36095 (Aug. 3, 2017). The goal of this program is to clean up hazardous waste sites, protect human health and the environment, and return affected property to productive use. Thuot Aff. ¶ 8.

Toward that end, the United States now seeks a warrant further extending EPA's access to the Site for two years, under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), so the agency

can complete its remedial investigation and feasibility study, issue a Proposed Plan and ROD, and commence a remedial design. *Id.* ¶¶ 1, 12, 53; *see* 40 C.F.R. §§ 300.430(a), (d)-(e) and 300.435(a)-(b) (describing nature and purpose of remedial investigation, feasibility study, and remedial design, respectively). EPA and its contractors made significant progress in the initial access periods, described below, but an extension is necessary because of delays in the investigation and study process, stemming primarily from two factors. First, EPA needed to do additional sampling and risk assessment to fully characterize the nature and extent of the contamination and to identify ecological risks, on or related to the Property. Thuot Aff. ¶ 13. This included the conduct of a Baseline Ecological Risk Assessment after results of the Screening Level Ecological Risk Assessment revealed unacceptable ecological risks that required further investigation, such as the testing of sediment toxicity. Second, EPA needed to shift the focus of the FS, from consideration of remedial alternatives using a Site-wide approach to consideration of remedial alternatives for only the most contaminated areas of the Site, which are located on the Property. This new approach will result in an improved Site clean-up plan and remedy, but will not require additional time to complete.

Commencement of a remedial design is necessary for EPA to determine the specific labor, equipment and materials needed to perform a remedial action ("RA") addressing the voluminous hazardous substances on and below the surface of the Property and Site, as well as the timeline for such a cleanup action, 40 C.F.R. § 300.435(a)-(b). An access warrant for these purposes is justified because (1) the corporate owner of the Property was dissolved decades ago, the Property has been abandoned, inactive, and unoccupied, and EPA has been unable to find anyone willing or able to grant access without intervention by the Court (Thuot Aff. ¶¶ 22-26, 31, 42-43); (2) the United States is authorized under Section 104(e) of CERCLA, 42 U.S.C. §9604(e), to enter and investigate contamination at the Site; (3) the Court is authorized

4

to issue the requested warrant (*see infra*); and (4) if not timely addressed, the contamination at the Property will continue to pose a threat to human health and the environment (*id.* ¶¶ 27, 58).

Accordingly, the United States files this application for extension, together with this supporting memorandum, the affidavit of Remedial Project Manager ("RPM") Lisa Thuot, and other papers submitted herewith, and respectfully seeks access to the Property for an additional two years, the time EPA estimates it needs to complete its investigation of conditions on and under the Property, to determine the feasibility of a remedial action, and to commence the design of a remedy necessary to protect public health and the environment.

By this application, the United States seeks access to perform investigation and design work; it is not seeking access to perform the remedial action itself. If and when, EPA confirms that remedial action is necessary to address hazardous substances at and around the Property, and better understands the nature, scope and expected duration of that action, if it is still unable to secure access voluntarily, the United States may seek a separate warrant or order from the Court to perform cleanup work at the Property.

## II.    BACKGROUND

### A.    The Property was Used for Industrial Purposes and is Near Residences, Businesses, and Environmental Resources

From 1967 to 1987, Microfab used the Property for industrial purposes, including the manufacture of circuit boards, electroplating, and other metal finishing operations. Thuot Aff. ¶ 21. The Property includes a large abandoned factory building constructed of brick, corrugated steel, and concrete block. *Id.* ¶¶ 17, 31. An unnamed stream runs along the western boundary of the Property and drains into a large wetland to the south, which is connected hydrologically to the Merrimack River. *Id.* ¶ 18. A tributary of that stream runs from east to west along the southern border of the Property. *Id.* The Property is located in a mixed commercial, industrial, and residential area. *Id.* ¶ 19. The Property is bounded to the north by Haverhill Road (a/k/a

Highway 110), to the east by woodlands and a commercial property, to the west by the unnamed stream described above and another commercial property, and to the south by woodlands, the above-referenced tributary, a utility company property including a live electrical transmission line, and a large wetland. *Id.* Residential properties are located near the Property, to the north, immediately across Haverhill Road, and a quarter mile to the south, off of Middle Road. *Id.*

**B.     Access Is Necessary to Investigate Contamination that Threatens Public Health and the Environment**

Between 1967 and 2015, MassDEP, the City, and EPA conducted investigations of the Property. *Id.* ¶ 28. Samples collected from the Property indicate the presence of numerous contaminants, including volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), cyanide, and heavy metals, in multiple media, including groundwater, surface water, sediment, and shallow soils, at concentrations far exceeding background levels. *Id.* ¶¶ 28-29. In 2013, a MassDEP contractor conducted groundwater sampling and found exceedances of the Massachusetts Contingency Plan groundwater standards for certain VOCs, including trichloroethylene ("TCE"), cis-1,2-dichloroethylene, 1,1-dichloroethene, trans-1,2-dichloroethene, and vinyl chloride. *Id.* ¶ 29. EPA investigations in 2015 supported these findings. *Id.* All of these contaminants are hazardous substances under CERCLA and its implementing regulations. 42 U.S.C. § 9601(14); 40 C.F.R. § 302.4; Thuot Aff. ¶¶ 28-29.

The Property has been abandoned for decades and, despite EPA's efforts to improve security, trespassers and vandals, including area residents and children, have accessed the Property and could be exposed to contaminants there. *Id.* ¶ 31. The building is in poor condition, with damaged structural integrity, including roof leaks and collapsed floors. *Id.* ¶¶ 17, 31. In 2019, EPA added a new perimeter fence to secure the property, including new entrance gates and signage that identifies the Property as an EPA Superfund site at which there should be no trespassing. *Id.* ¶ 31. EPA has barricaded several openings into the former factory

6

building with plywood. *Id.* Nevertheless, trespassers have periodically entered the building by breaching barricades, cutting holes in the perimeter fence, and/or scaling the building and entering via the roof. *Id.* The City stated that it has attempted to barricade the building doors in the past, but the City also has not been successful in keeping out trespassers. *Id.* Since manufacturing operations at the Property ceased, the Amesbury Police Department has responded to several fires and other incidents on the Property. *Id.*

Therefore, EPA concluded that its continued performance of a remedial investigation and feasibility study is needed to determine the nature and extent of contamination at the Site, the risk such contamination presents to human health and the environment, and remedial actions that may be needed to address such risks. *Id.* ¶¶ 30, 32. In August 2018, in Case No. 18-mj-04223-DHH, EPA filed an ex parte application for a warrant granting three years of access to the Property so EPA could perform a removal site evaluation and a remedial investigation and feasibility study. *Id.* ¶ 9. The Court granted EPA's request and issued a warrant for access until August 15, 2021. *Id.* ¶¶ 9, 33. During that three-year period, EPA completed the removal site evaluation and made progress on, but did not complete, the remedial investigation and feasibility study. *Id.* Therefore, in August 2021, EPA filed an ex parte application for a warrant granting an additional two years for the agency to complete its remedial investigation and feasibility study. *Id.* On August 10, 2021, in Case No. 21-mj-04228-DHH, the Court granted EPA's request and issued a warrant granting access until August 10, 2023. *Id.* ¶¶ 9, 34. During that time, EPA made progress on the investigation and study, but did not complete it. *Id.* Therefore, on August 8, 2023, in Case No. 23 MJ 04459 DHH, the United States applied ex parte for three years of additional access to the Site in order to complete the remedial investigation and feasibility study, and to commence remedial design activities. *Id.* ¶¶ 9, 49. On August 9, 2023, this Court granted the application. *Id.* ¶¶ 9, 35. During this latest

access period, EPA completed all the RI field investigation activities and the human health and ecological risk assessments. *Id.* The FS work is currently in progress, but is not yet completed. *Id.* So, now, EPA anticipates that it will need additional time to complete the remedial investigation and feasibility study, prepare a Proposed Plan for public comment, issue a Record of Decision selecting a remedy, and commence the Remedial Design. *Id.* ¶¶ 1, 9, 35-36, 53.

**C.      The United States Seeks Access for Limited But Important Remedial Investigation and Design Purposes**

The goals of the remedial investigation and feasibility study include characterization of the nature and extent of contamination at the Site, filling in data gaps, performance of human health and ecological risk assessments, and understanding the conditions, so that EPA can formulate and evaluate potential remedial alternatives for the Site, including the Property. *Id.* ¶¶ 32, 37-38. To achieve these goals, EPA will need to maintain the Property by, for example, landscaping, repairing perimeter security fences, replacing stolen or damaged signage, and removing snow, to keep the Property accessible and secure, and providing tours of the Property, as needed, to City representatives, EPA contractors, and/or State representatives. *Id.* ¶¶ 32, 37.

In addition, EPA will need to continue to maintain temporarily on the Property equipment and sampling-related materials, such as soil, sediment, water, containers, hazardous substances, and building debris. *Id.* ¶ 32. EPA will also likely continue to take photographs or videos of the performance of the remedial investigation and feasibility study and of the Property's evolving condition. *Id.* All of these activities are standard elements of an RI/FS under CERCLA. *Id.*

Under the Court's 2018 access warrant, EPA's contractor performed the initial phase of the agency's remedial investigation and feasibility study work. *Id.* ¶ 33. This investigation and study work included: (a) Site preparation, including the installation of new entrance gates and perimeter fencing, the clearing of tree and vegetation, the connection of electrical/utility services, snow removal, and the placement of signage; (b) Site setup, including placement on the Property

of a temporary Site trailer, equipment storage units, investigation derived waste collection containers, and work sanitation facilities; (c) drilling for new groundwater wells and subsurface soil borings; (d) conducting Site surveys, including a wetlands delineation and geophysical surveys; (e) conducting a historical Site evaluation; (f) installing new overburden and bedrock groundwater monitoring wells; (g) investigation of Site geology and fracture orientation, including bedrock borehole geophysics; and (h) sampling sediment, surface water, pore water, groundwater, and soils, at the surface and belowground.  *Id.*

Under the Court's 2021 access warrant, EPA made additional progress on theremedial investigation and feasibility study, including among other things:  (a) maintenance, such as snow removal, landscaping, installation of additional warning signs, including replacing stolen and damaged signs, repairing perimeter security fencing, sealing openings in the damaged former factory building, repairing groundwater monitoring wells, and disposing of hazardous and non-hazardous investigation-derived waste; (b) drilling and installation of twelve new groundwater monitoring wells; (c) collection of subsurface soil borings for the analysis of VOCs; (d) investigation of Site geology and fracture orientation, to identify spaces that may be conveying contaminated groundwater; (e) extensive high resolution site characterization, to identify subsurface areas of high VOC concentrations and target new monitoring well locations; (f) re-collection of water samples to generate new data to replace those that had been invalidated due to COVID-related laboratory staff shortages; (g) field activities to support human health and ecological risk assessments, including installation of soil-gas probes around an occupied commercial building, collection of soil-gas samples to assess the risk of vapor intrusion, and ecological habitat and value assessment characterizations of flora and fauna, to identify ecological species that may be at risk from contamination; (h) performance of a temperature probe survey in wetlands and a stream, to identify potential upwelling of contaminated

groundwater into surface water; and (i) coordination with private property owners to obtain data and information in nearby areas. *Id.* ¶ 34.

In the three years following the Court's 2023 access warrant, EPA made additional progress on the remedial investigation and feasibility study, including among other things: (a) installation of additional groundwater monitoring wells in shallow overburden and deep bedrock on and near the Property; (b) borehole geophysics investigations in the new bedrock wells, to identify fractures capable of transporting subsurface water and contaminants; (c) installation of an access road to the on-Property wetlands, to further investigate wetland sediment and surface soil near and downstream of the former Microfab wastewater outfall; (d) installation of temporary facilities, including an office and storage trailer with electrical service and sanitary facilities; (e) supplemental sampling of on-property and off-property sediment and surface water, to support the Baseline Ecological Risk Assessment; (f) updating and reinstallation of signage, resecuring with plywood open windows and doors in the former factory building; (g) repairing damaged fences; (h) providing tours to City officials and State representatives; and (i) mobilization of a roll-off container for dry waste and a frac tank for liquid waste derived from EPA's investigations. *Id.* ¶ 35.

Despite this significant progress, additional time is needed to complete the remedial investigation and feasibility study, due primarily to the two factors referenced above. *Id.* ¶¶ 13, 30. Though EPA did not complete the investigation and study, it gathered sufficient information to determine that a remedial design and remedial action will be necessary at the Site, including the Property. *Id.* ¶ 11. EPA estimates it will need two years of additional access to the Property in order to complete the investigation and study, prepare a Proposed Plan, issue a Record of Decision selecting a remedial action, and commence a remedial design. *Id.* ¶¶ 1, 36-37, 51, 53.

In order to complete the remedial investigation and feasibility study, EPA must conduct additional activities on the Property, including: (a) maintenance, such as landscaping (e.g., tree and vegetation trimming and removal), repair of perimeter fencing, replacement of stolen or damaged signage, and snow removal, to keep the Property accessible and secure; and (b) provision of site inspections, as needed, to City representatives, EPA contractors, and/or State representatives. *Id.* ¶ 37.

In order to commence the remedial design, EPA will need access to the Property for the following purposes: (a) showing the property to prospective remedial design contractors; (b) mobilization by EPA's selected contractors, including, e.g., installation of a field trailer, equipment storage unit, waste collection containers, and worker sanitation facilities; (c) visits by contractors to assess contamination and logistical issues; (d) maintenance, such as snowplowing, landscaping, tree and vegetation trimming and removal, and fence repairs; (e) pre-design investigation and additional data collection, including, e.g., hydrogeological investigations of groundwater or surface water, monitoring well installation and development, pump tests, water level measurements, subsurface geophysics surveys, water sampling, and collection of additional soil or sediment samples; (f) treatability studies to evaluate potential remedial alternatives and treatment technologies; and (g) arranging for the transport and disposal off-site of waste. *Id.* ¶ 38; *see* 40 C.F.R. § 300.435(a)-(b).

EPA has determined that these expected investigation and design activities will take up to two years to complete. *Id.* ¶¶ 12, 36, 51.

EPA cannot know what future investigations will uncover. Therefore, it is impossible to estimate precisely when the remedial investigation and feasibility study will be completed. *Id.* ¶ 53. But EPA expects that all outstanding elements of the remedial investigation and feasibility study and commencement of the remedial design will be completed by August 2028. *Id.* ¶¶ 12,

36, 51. Specifically, EPA expects that tasks related to site security will take two weeks; the evaluation of remedial measures will take 10 weeks; completion of a draft FS report, submission to EPA, any comments by EPA, finalization of the report, preparation of a Proposed Plan, and issuance of a Record of Decision selecting a remedy, will take 20 weeks; selection of a remedial design contractor and contracting and funding for the transition from remedial investigation to design will take 16 weeks, and pre-design investigation, treatability studies, pilot testing for the remedial design, and Property maintenance work will take 48 weeks. *Id.* ¶ 53. In addition, the schedule plans for contingencies by including eight weeks for anticipated delays, for a total of 104 weeks (i.e., two years). *Id.* at 53-54. Performance of some of these tasks may overlap, but most will be performed serially, one after the other. *Id.* The schedule accounts for that by listing the weeks that each task will add to the schedule, for a total of 104 weeks. *Id.*

To complete the investigation and study and commence the design, as is normally the case at Superfund sites, EPA plans to rely on contractors with long-term contracts covering the entire period of the investigation, study, and design. *Id.* ¶ 55. During that time, the contractors will need frequent access to the Property in order to perform investigative tasks, evaluate remedial alternatives, and conduct treatability studies of potential clean-up technologies. *Id.* According to EPA, these contractors must have uninterrupted access to the Property so they can meet their contractual obligations and so EPA can meet its remedial milestones in a manner that protects human health and the environment. *Id.*

If the results of the investigation and study confirm that a remedial action is necessary, EPA may need access to the Property for additional time to perform this cleanup work. *Id.* ¶ 56. In that case, EPA may seek a further extension of the access warrant or other appropriate order allowing the agency to access the Property to conduct the selected remedial activities. *Id.* Thus, while the United States knows now that EPA needs at least two more years to complete the

remedial investigation and feasibility and commence an remedial design, it is not seeking additional time to complete the remedial design or to perform a remedial action, unless and until it determines the steps necessary to complete the design, has enough information to estimate the time frame for doing so, confirms that a remedial action is necessary based on the results of the completed investigation and study, and determines the nature and extent of the remaining design activities and anticipated action.  *Id.*

**D.    Despite Reasonable Efforts, EPA Has Been Unable to Gain Access to the Property Without Court Assistance**

From 1977 to 1987, records indicate that EPA gained access to the Site voluntarily, with the permission of Microfab, before the company filed for bankruptcy, to address potential violations of the Clean Water Act's National Pollution Discharge Elimination System, 33 U.S.C. § 1342.  Thuot Aff. ¶ 39.  But at least since 2014, after Microfab's bankruptcy, EPA has been unable to gain access to the Property without assistance from this Court.  *Id.*

On April 10, 2015, in Case No. 15-mj-4175-DHH, the United States applied *ex parte* to the Court for an administrative warrant authorizing EPA to access the Property, in order to evaluate whether there was a release or threatened release of a hazardous substance at or from the Site and whether the Site was eligible for inclusion on the National Priorities List ("NPL"), a list of the most contaminated hazardous waste sites in the country.  Thuot Aff. ¶¶ 7, 40; 40 C.F.R. Part 300, App. B.  In this application, the United States explained that the Property had been abandoned and that, despite extensive efforts, EPA had been unable to locate anyone willing to grant access on behalf of Microfab.  *Id.*

On April 16, 2015, the Court granted the United States' application and issued an administrative inspection warrant effective for 120 days.  *Id.* ¶ 41.  That warrant allowed EPA to gather and analyze the soil, sediment, and surface water samples necessary to make its initial

assessment of environmental conditions at the Site. *Id.* Based on that assessment, EPA determined that the Site should be added to the NPL. *Id.*

In 2016 and 2017, EPA attempted to identify owners and operators of the Site by conducting information and file reviews, and title and corporate research. *Id.* ¶ 42. EPA sent access request letters to a former President and Treasurer of Microfab, both of whom responded that they had no ownership interest in Microfab and did not have authority to grant EPA access to the Property. *Id.* EPA also sent access request letters to former shareholders and officers of Semicon, Inc., which owned Microfab, and Microsemi Corp. (which at one point had an ownership interest in Semicon), but all responded that they too did not have authority to grant EPA access to the Property. *Id.* EPA's unsuccessful efforts to gain access to the Site voluntarily are documented in correspondence and other files attached to and referenced in the accompanying Affidavit of EPA Remedial Project Manager Lisa Thuot. *Id.* ¶ 42 & Ex. 12.

On June 29, 2018, in Case No. 18-mj-04223-DHH, the United States applied *ex parte* to this Court for an administrative warrant authorizing EPA to access the Property for three years in order to perform a removal site evaluation, a remedial investigation and study, and activities related thereto, under Sections 104(a), (b), and (e) of CERCLA, 42 U.S.C. §§ 9604(a), (b), and (e). *Id.* ¶ 44. On August 15, 2018, this Court issued the requested warrant, granting EPA access to the Property for three years to perform the remedial investigation and study, and a removal site evaluation. *Id.* ¶ 45.

On April 5, 2019, in Case No. 19-mj-04249-DHH, based on the results of its removal site evaluation, the United States applied *ex parte* for an administrative warrant authorizing EPA to access the Property for six months to perform a removal action at the Property, activities that were different than those authorized under the August 2018 warrant. *Id.* ¶ 46. On April 18,

14

2019, this Court granted the United States' application and issued the requested six-month warrant. *Id.* ¶ 47.

On August 10, 2021, in Case No. 21-mj-04228-DHH, this Court granted the United States' application and issued a warrant for two years of additional access, until August 10, 2023. *Id.* ¶ 48.

On or about August 8, 2023, in Case No. 23-MJ-04459-DHH, the United States applied *ex parte* for three years of additional access to the Site, in order to complete the remedial investigation and study and commence remedial design activities. The following day, this Court granted that application. *Id.* ¶ 49.

Since its initial application for an access warrant, EPA has attempted diligently to gain access to the Property voluntarily, to no avail. *Id.* ¶ 50. EPA knows of no change in the ownership status of the Property or any other relevant circumstances that would enable it to gain access to the Property voluntarily. *Id.* To this day, EPA has been unable to identify any agents or other representatives of Microfab, individuals or organizations with an ownership interest in the Property, or anyone else willing and able to grant access to the Property. *Id.*

For the reasons discussed above, therefore, EPA respectfully seeks a new warrant granting access to the Property for two more years, in order to complete its remedial investigation and feasibility study, issue a Proposed Plan and select a remedy in a Record of Decision, and commence a remedial design. The investigatory and design work performed in this two-year period will provide critical information for determining the nature and extent of any further remedial work required to address hazardous substances at the Property and the Site.

E.    **Because EPA has been Unable to Identify Anyone with Authority to Grant Access Voluntarily, It Seeks an Access Warrant from the Court**

Because the Property's owner is a dissolved corporation, and because EPA has been unable to find anyone with authority to grant access voluntarily, the United States respectfully

15

seeks a warrant from the Court for two more years of access to the Property.  *Id.* ¶¶ 12, 36, 51.

Filed herewith is a proposed warrant grants such access.  *Id.*  If the Court grants this application,

EPA will use its best efforts to complete the remedial investigation and feasibility study, and

commence the remedial design promptly and diligently, in accordance with applicable law and

regulations, and in coordination with the appropriate federal and state agencies, including

MassDEP.  *Id.* ¶ 52.

**F.**     **This Application is Uncontested**

To EPA's knowledge, this application for a warrant for access to the Property for two

years is uncontested.  *Id.* ¶ 57.  On the contrary, key stakeholders, including MassDEP, the City

of Amesbury, and residents and businesses located near the Property, all support EPA's efforts to

investigate and clean up hazardous substances at this abandoned industrial property as soon as

possible within the anticipated time frame.  *Id.*

### III.     DISCUSSION

**A.**     **Legal Standard**

Congress enacted CERCLA, 42 U.S.C. §§ 9601-9675, in response to widespread concern

over the severe environmental and public health effects arising from the improper disposal of

hazardous wastes and other hazardous substances.  *See generally Key Tronic Corp. v. United

States*, 511 U.S. 809, 814 (1994); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 805

F.2d 1074, 1078, 1081 (1st Cir. 1986); *Eagle Picher Indus. v. EPA*, 759 F.2d 922, 925-26 (D.C.

Cir. 1985).  EPA has broad authority to use funds in the Hazardous Substance Superfund created

by CERCLA, to enter, investigate and clean up hazardous waste sites.  42 U.S.C. § 9604(a), (b)

and (e).  CERCLA Section 104(e)(1) authorizes the President or his delegated representative[1] to

exercise the access authority of Section 104(e) for the broad purposes of "determining the need

---

[1] The President has delegated his authority under Section 104 of CERCLA to EPA.  Exec. Order No. 12580, § 2(g) and (i), 52 Fed. Reg. 2923, 2925 (1987).

for response, or choosing or taking any response action under [CERCLA], or otherwise enforcing the provisions of [CERCLA]." 42 U.S.C. § 9604(e)(1).  CERCLA defines "response" to mean "remove, removal, remedy, and remedial action."  42 U.S.C. § 9601(25).  A "removal" action is "the cleanup or removal of released hazardous substances from the environment," and may include "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances."  42 U.S.C. § 9601(23).  A "remedy" or "remedial action" is an action "consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment."  *Id.* § 9601(24); *see generally United States v. W.R. Grace & Co.*, 429 F.3d 1224 (9th Cir. 2005) (discussing "vague" and "overlap[ping]" definitions of removal and remedial actions), *cert. denied* 549 U.S. 951 (2006).[2]

EPA and its representatives are authorized to enter a property to conduct response activities when EPA determines that "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant."  42 U.S.C. § 9604(e)(1).  Once EPA makes such a determination, its authority to enter and access the property is far reaching.  *Id*.  Section 104(e)(3) authorizes EPA and its representatives to enter

---

[2]  Considering the phrase "monitor, assess, and evaluate" in the definition of removal, 42 U.S.C. § 9601(23), courts frequently classify a remedial investigation and feasibility study (or "RI/FS") as a removal action.  *See, e.g., Razore v. Tulalip Tribes of Washington*, 66 F.3d 236, 239 (9th Cir.1995), citing *South Macomb Disposal Auth. V. U.S. Environmental Protection Agency*, 681 F. Supp. 1244, 1246 (E.D. Mich. 1988) ("It is clear … that a[n] RI/FS taken by the EPA is a 'removal action' within the meaning of the statute [CERCLA]"); *see also* 40 C.F.R. § 300.425(b)(1) (referring to "removal actions" as "including remedial planning activities, remedial investigations and feasibility studies, and other actions taken pursuant to CERCLA section 104(b)").  But some courts have treated such investigations and studies as remedial action.  *See, e.g., City of Moses Lake v. United States*, 1023-24 (finding that "in an appropriate circumstance" a remedial investigation and feasibility study could be classified as a remedial action).  In any case, it is clear that such an investigation and study is a response action that EPA is authorized to perform under CERCLA.

any vessel, facility,[3] or establishment associated with a release or threat of release of hazardous substances, including property where entry is needed to determine the appropriate response or to effectuate a response action.  42 U.S.C. § 9604(e)(3).  Section 104(e)(6) authorizes EPA to secure such access in any lawful manner.  42 U.S.C. § 9604(e)(6).

Courts have interpreted Section 104(e) of CERCLA as permitting the same type of warrant authority as the United States seeks here.  *See In re Yoder's Slaughterhouse Site,* 519 F. Supp. 2d 574, 578-80 (D. Md. 2007) (concluding CERCLA authorizes issuance of administrative access warrant upon showing of reasonable efforts to obtain consent); *Koppers Indus. v. EPA*, 902 F.2d 756, 758 (9th Cir. 1990) (denying as moot appeal from district court's denial of motion to quash warrant issued under CERCLA Section 104(e)).  The court in *Yoder's* found that administrative warrants were inherently authorized under statutes that, like CERCLA, empower an agency to enter property.  *In re Yoder's*, 519 F. Supp. 2d at 578-89.  Because CERCLA grants EPA broad authorization to "remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant at any time," 42 U.S.C. § 9604(a), the statute inherently provides this Court with the authority to issue an administrative access warrant of similar scope.  *See id.*, at 579 ("And, the scope of the warrant that the Court finds it has the implicit power to enter is broad – as broad as necessary to enable the EPA to enter and perform the statutory mission set out in 42 U.S.C. § 9604.").  And such authority

---

[3]  Section 101(9), 42 U.S.C. § 9601(9), defines "facility" broadly as:

> (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) *any site or area where a hazardous substance has* been deposited, stored, disposed of, or placed, or otherwise *come to be located*; but does not include any consumer product in consumer use or any vessel.

(Emphasis added.)

becomes that much clearer given that courts should "construe [CERCLA's] provisions liberally to avoid frustration of the beneficial legislative purposes." *Dedham Water*, 805 F.2d at 1081.[4]

Thus, this Court's authority to issue an administrative access warrant to conduct EPA's proposed removal action exists *both* as a matter of explicit statutory authority under Section 104(e)(6) *and* as a function of the inherent authority granted by statutes that empower an agency to enter property.[5]  "When Congress invests an agency with enforcement and investigatory authority, it is not necessary [for Congress] to identify explicitly each and every technique that may be used in executing the statutory mission." *Dow Chemical Co. v. United States*, 476 U.S. 227, 233, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986).  Instead, "[r]egulatory or enforcement authority generally carries with it all the modes of inquiry and investigation traditionally employed or useful to execute the authority granted." *Id.*

Not only are warrants appropriate, but courts have determined that EPA may obtain them on an *ex parte* basis.  In *In re Bunker Hill Co. Lead & Zinc Smelter v. U.S. EPA*, the Ninth Circuit rejected Bunker Hill's objection to the issuance of an *ex parte* inspection warrant and affirmed that federal agencies have the ability to obtain *ex parte* warrants to conduct inspections. 658 F.2d 1280, 1285 (9th Cir. 1981) (citing *Stoddard Lumber Co. v. Marshall*, 627 F.2d 984 (9th Cir. 1980) (concerning OSHA inspection warrants issued to the Department of Labor)).  Both the Supreme Court and the Seventh Circuit have recognized *ex parte* administrative warrants as

---

[4]  A finding that CERCLA inherently bestows on courts the authority to issue administrative access warrants is consistent with other courts' interpretations of analogous environmental statutes.  For example, several courts have found that the Toxic Substances Control Act, by authorizing EPA to inspect facilities, inherently authorizes the issuance of administrative warrants.  *See*, *e.g.*, *United States v. M/V Sanctuary*, 540 F.3d 295, 300 (4th Cir. 2008) (listing cases with that holding and similar holdings under the Occupational Safety and Health Act, Immigration and Nationality Act, and Clean Air Act).

[5]  The court in *Yoder's* did not rely on CERCLA Section 104(e)(6), 42 U.S.C. § 9604(e)(6), reasoning that the grant to secure access in "any other lawful manner" in Section 104(e)(6) did not apply to securing access for a removal action, because "[t]here is no provision in [Section 104(e)] for removal and/or disposal," as opposed to inspection and sample taking.  *Id.* at 577.  That interpretation is incorrect. Section 104(e)(3)(D) expressly authorizes entry "to effectuate a response action under this subchapter," 42 U.S.C. § 9604(e)(3)(D), and Section 104(e)(1) authorizes action "for the purposes of determining the need for response, or choosing or taking any response under this subchapter…." 42 U.S.C. § 9604(e)(1).

ordinary access mechanisms in regulatory enforcement. *See Patel*, 576 U.S. at 423 (referencing general propriety of *ex parte* administrative warrants in regulatory settings); *National-Standard Co. v. Adamkus*, 881 F.2d 352, 363 (7th Cir. 1989) (upholding *ex parte* administrative warrant under Resource Conservation and Recovery Act ("RCRA"), stating "ex parte proceedings are the normal means by which warrants are obtained in both criminal and administrative actions."); *cf. Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978) (suggesting *ex parte* administrative warrants are appropriate under Occupational Safety and Health Act).

Administrative agencies "may obtain . . . warrants *ex parte* even when surprise is not necessary." *Bunker Hill*, 658 F.2d at 1285; *see also Boliden Metech, Inc. v. United States*, 695 F. Supp. 77, 82-83 (D.R.I. 1988) (approving *ex parte* warrant process under Toxic Substances Control Act over objection of facility operator); *accord In re Stanley Plating Co.*, 637 F. Supp. 71, 73 (D. Conn. 1986) (*ex parte* warrant under Resource Conservation and Recovery Act); *In re Order Pursuant to Section 3013(d) RCRA, 42 U.S.C. § 6934(d)*, 550 F. Supp. 1361, 1364 (W.D. Wash. 1982) (same).

Accordingly, in 2015, 2018, 2019, 2021, and 2023, this Court granted the United States' *ex parte* applications for administrative inspection warrants, allowing EPA to access the Microfab Property, for 120 days to conduct an initial investigation of environmental conditions, for three years to perform a removal site evaluation and a remedial investigation and study, for six months (overlapping the previously granted three-year access period) to perform a removal action, for two years to continue the investigation and study, and for three years to further implement the investigation and study.

Thus, under the circumstances of this case, an *ex parte* administrative warrant extension is an appropriate means for EPA to gain access to the Property to perform a CERCLA response action.

**B.      Granting Access is Reasonable and Serves the Public Interest**

Under CERCLA Section 104(e), the standard for determining if a court shall issue an administrative warrant for access and entry is whether "there is a reasonable basis to believe there may be a release or threat of release of a hazardous substance or pollutant or contaminant." *United States v. Fisher*, 864 F.2d 434, 437 (7th Cir. 1988).  The standard for cause justifying the issuance of an administrative warrant is less rigorous than a search and seizure warrant in a criminal investigation and requires only a showing of either "specific evidence of an existing violation" or "reasonable legislative or administrative standards" for conducting an inspection. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 538 (1967)).  Where "a valid public interest justifies the intrusion contemplated, then there is probable cause to issue a suitably restricted search warrant." *Camara*, 387 U.S. at 539 (citing *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186 (1946)).

As described above, a reasonable basis exists to believe that a release of hazardous substances, or the threat of such a release, exists at the Microfab Property.  Indeed, between 1967 and 2015, various entities, including the City, MassDEP, and EPA, found elevated levels of numerous hazardous substances present on and below the surface of soils and sediments, and in surface water and groundwater, at the Property.  Thuot Aff. ¶¶ 28-29.  The Property is often unoccupied and security is difficult to assure, so trespassers and vandals, including area residents and children, may be exposed to contaminants there. *Id.* ¶ 31.

Considering that, except for EPA's presence, the Property is abandoned and unoccupied, without any ongoing industrial, commercial, or residential activity, the requested access is only minimally intrusive and the benefits far outweigh any potential cost.

21

Under these circumstances, considering the compelling public interest that would be served by continuing EPA's access to the Property, the issuance of an administrative warrant extending access is justified.

**C.     Granting Further Access *Ex Parte* Is Justified**

There is a compelling public interest in continuing to investigate the environmental conditions and potential hazards on the Property and in commencing a remedial design.  But the Site Property's corporate owner has been dissolved, the Property has been abandoned and unoccupied for years, and despite extensive efforts, EPA has found no one willing or able to grant entry onto the Property.

Administrative agencies "may obtain . . . warrants *ex parte* even when surprise is not necessary."  *Bunker Hill Co. Lead and Zinc Smelter*, 658 F.2d at 1285; *accord In re Stanley Plating Co.*, 637 F. Supp. 71, 72 (D. Conn. 1986) (*ex parte* warrant granted under Resource Conservation and Recovery Act); *In re Order Pursuant to Section 3013(d) RCRA, 42 U.S.C. § 6934(d)*, 550 F. Supp. 1361 (W.D. Wash. 1982) (same).  Indeed, "ex parte proceedings are the normal means by which warrants are obtained in both criminal and administrative actions." *National-Standard Co. v. Adamkus*, 881 F.2d 352, 363 (7th Cir. 1989).

Thus, as this Court found in 2015, 2018, 2019, 2021, and 2023, granting EPA's application *ex parte* is necessary to serve important statutory environmental and public health interests and is fully justified.

**IV.     CONCLUSION**

The United States therefore respectfully requests that this Court issue the accompanying uncontested *ex parte* administrative warrant extension authorizing EPA and its representatives to enter the Property for two more years for the purposes identified in the warrant, including completing the ongoing remedial investigation and feasibility study, and commencing a remedial

22

design.  In order to avoid significant additional delays and costs, and associated risks to human health and the environment, the United States respectfully requests that the Court **expedite its review** of this application **and sign the attached access warrant on or before August 10, 2026**, when the current access warrant expires, or as soon as possible during the following week.

Respectfully submitted,

ALLOWED David H. Hennessy U.S.M.J.
Aug 10, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

Dated:  August 7, 2026

/s/ David Laufman Weigert
DAVID LAUFMAN WEIGERT
Senior Counsel
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC  20044-7611
Phone:  (202) 514-0133
Fax:  (202) 616-2427
E-Mail:  david.weigert@usdoj.gov

LEAH BELAIRE FOLEY
United States Attorney

LINDSEY ROSS
Assistant U.S. Attorney
U.S. Attorney's Office, District of Massachusetts
One Courthouse Way, Suite 9200
Boston, MA 02210
Phone:  (617) 748-3499
E-Mail:  lindsey.ross@usdoj.gov

OF COUNSEL:

MAXIMILIAN BOAL
Senior Enforcement Counsel
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 1
5 Post Office Square, Suite 100
Boston, MA 02109
E-Mail:  boal.maximilian@epa.gov